
FILED
IN OPEN COURT

DEC - 2 2013

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:13-CR-466 |
| | ) | |
| ANTHONY R. BILBY, | ) | |
| | ) | |
| Defendant. | ) | |

## STATEMENT OF FACTS

The United States and the defendant, ANTHONY R. BILBY, stipulate that the allegations in the one-count Criminal Information and the following facts are true and correct. The United States and BILBY further stipulate that had the matter gone to trial, the United States would have proven the allegations in the Criminal Information and the following facts beyond a reasonable doubt:

### BACKGROUND

1. From in or about March 2007 through in or about March 2008, the defendant, ANTHONY BILBY, was employed by Company K as an outside sales representative. Throughout BILBY's employment with Company K, the company was located within the Eastern District of Virginia. BILBY worked on site at Company K's offices.

2. In or about April 2008, several principals of Company K also became principals of a new company, which is referred to herein as Company T. From in or about April 2008 through in or about July 2013, BILBY was employed by Company T as an outside sales representative. Throughout BILBY's employment with Company T, the company was located within the Eastern District of Virginia. BILBY primarily worked on site at Company T's offices.

3. During his time with Companies K and T, BILBY primarily worked in resales of information technology ("IT") products and value added services. BILBY arranged for Companies K and T to purchase IT products from manufacturers and resell them to end users at a profit. Many of BILBY's clients were agencies of the federal government.

4. Companies K and T certified themselves to be Service Disabled Veteran Owned Small Businesses ("SDVOSB"). Pursuant to federal law, SDVOSB companies received preferential consideration in certain federal government contracts.

5. Company F was another IT value added reseller located within the Eastern District of Virginia. Company F was not related to Companies K or T. Company F also certified itself to be SDVOSB.

6. Except where authorized under a "sole source" contract proposal, federal government contracts generally could be awarded only upon the submission and consideration of bids, or best price quotes, from more than one company. In general, the requirement to obtain multiple bids applied both to open market government contracts and to those that had been set aside for SDVOSB companies.

7. Companies wanting to bid on and be awarded federal contracts governed by the Federal Acquisition Regulations ("FAR") were required to register in the Central Contractor Registry ("CCR") and in the Online Representations and Certifications Application ("ORCA"). In 2012, CCR and ORCA were combined into an application called System for Award Management. Formal certification of ORCA data occurs when a vendor signs a solicitation. At that time a vendor is certifying that data in ORCA is current, accurate, and complete.

8. Pursuant to the FAR, bids on government contracts submitted by Companies K and T included a "Certificate of Independent Price Determination." This certificate stated, in pertinent part:

> (a) The offeror certifies that—
>  (1) The prices in this offer have been arrived at independently, without, for the purpose of restricting competition, any consultation, communication, or agreement with any other offeror or competitor relating to—
>   (i) Those prices;
>   (ii) The intention to submit an offer; or
>   (iii) The methods or factors used to calculate the prices offered.
>  (2) The prices in this offer have not been and will not be knowingly disclosed by the offeror, directly or indirectly, to any other offeror or competitor before bid opening (in the case of a sealed bid solicitation) or contract award (in the case of a negotiated solicitation) unless otherwise required by law; and
>  (3) No attempt has been made or will be made by the offeror to induce any other concern to submit or not to submit an offer for the purpose of restricting competition.

FAR Subpart 52.203-2.

THE CONSPIRACY

9. Starting on or about April 25, 2007 and continuing until on or about November 7, 2012, BILBY conspired with others to obtain federal government contracts through fraud and misrepresentation.

THE MANNER AND MEANS

*Access to Internal Government Procurement Process*

10. BILBY gained access to internal government documents, such as Internal Government Cost Estimates ("IGCEs"), in advance of bidding on government contracts. Co-conspirators working within the government provided BILBY with the IGCEs.

11. BILBY drafted portions of internal government procurement documents. BILBY drafted such documents in a manner that increased the likelihood that Company T would win contracts without facing actual competition.

*Payments to Co-Conspirators Working Within the Government*

12. Company T, acting with the knowledge and assent of BILBY and other Company T personnel, agreed to pay co-conspirators working within the government. These co-conspirators provided Company T with a competitive advantage by disclosing IGCEs to BILBY and by advocating on Company T's behalf within the government.

*Loser Bid Practice*

13. BILBY and other conspirators created bids on behalf of nominal competitors, such as Company F, that were higher than the bids submitted by Companies K or T. These higher bids would generally include the nominal competitor's corporate logo and other identifying corporate information, along with line items detailing descriptions, quantities, and pricing. For ease of reference, this Statement of Facts will refer to the higher bid, or best price quote, prepared by an employee of one company, on the price quotation template of another company, for submission to the government as a "loser bid."

14. The co-conspirators knew and understood that a loser bid was not a true competing bid, that it was not intended to win the contract, and that it would have the effect of providing the appearance of competition so that the intended winning bid could win without facing actual competition. In some cases, the loser bid process was also utilized so that the intended winning company would enhance and protect its relationships with respective federal agency customer markets without exposing those markets to actual competition.

15. The co-conspirators knew that the company submitting a loser bid may not be in a position to execute the contract if it happened to win.

16. The co-conspirators knew and intended to financially benefit each other by repeating the loser bid practice over a series of contracting opportunities. In some cases Companies K or T were intended to win a contract, and their sales employees created loser bids for Company F or another company involved in the conspiracy to submit to the government. In other cases, Company F was intended to win a contract, and sales employees of that company created a loser bid for Companies K or T to submit to the government.

OVERT ACTS

17. In furtherance of the conspiracy and to achieve the objects and purposes thereof, BILBY and his co-conspirators committed and caused to be committed the following overt acts, among others, in the Eastern District of Virginia and elsewhere:

2007 EPA Contract

18. On or about August 14, 2007, within the Eastern District of Virginia, BILBY caused Thomas Flynn, a Company F employee, to submit a loser bid on a contract opportunity with the U.S. Environmental Protection Agency ("EPA"). The loser bid was approximately eight percent higher than the bid that BILBY submitted on the same contract opportunity on behalf of Company K.

19. On or about September 7, 2007, EPA awarded the contract to Company K.

2008 CBP Contracts

20. In or about the summer of 2008, BILBY drafted portions of an internal document for the Department of Homeland Security, Customs and Border Protection ("CBP") at the

request of M.R., a contracting officer's technical representative within CBP. The internal document was known as a Justification for Other Than Full and Open Competition. In the internal document, BILBY identified Companies T and F as SDVOSB companies capable of providing the goods and services at issue for two upcoming CBP procurements.

21. On or about September 15, 2008, within the Eastern District of Virginia, BILBY caused Company T to submit bids on the CBP contract opportunities referenced in Paragraph 20. On or about the same date, within the Eastern District of Virginia, BILBY caused Thomas Flynn, a Company F employee, to submit loser bids on both contract opportunities. The loser bids submitted by Company F were approximately five percent higher in total than the bids submitted by Company T.

22. On or about September 21, 2008, CBP awarded the contracts at issue to Company T. The total award amount for the two contracts was in excess of $4 million.

### 2009 CBP Contract for WAN Optimization

23. On or about July 1, 2009, M.R. was informed by a supervisor that CBP had decided to order and implement ~~software~~ technology for Wide Area Network ("WAN") Optimization. The supervisor instructed M.R. to put together an acquisition package. On or about the same day, M.R. relayed this information to BILBY.

24. On or about July 24, 2009, within the Eastern District of Virginia, BILBY sent an e-mail to several senior personnel at Companies K and T, and stated in pertinent part, "I need to find 2 other friendly SDVOSB companies with a GSA schedule. I already have [Company F]." On or about the same date, a principal of Companies K and T identified another SDVOSB company that would be willing to engage in "friendly" bidding.

25. On or about August 5, 2009, within the Eastern District of Virginia, BILBY sent an e-mail to M.R.'s personal e-mail account and attached Market Research and Acquisition Plan documents for the WAN Optimization procurement. BILBY sent these documents using a generic e-mail account that he had established for the sole purpose of transmitting documents to M.R. without making it obvious that the documents came from an outside vendor. The attached documents contained a justification for awarding WAN Optimization to an SDVOSB company, and identified three companies—Company T, Company F, and the additional "friendly" SDVOSB company suggested by a principal of Companies K and T—as capable of fulfilling the procurement. BILBY in fact knew that, of the three identified companies, only Company T had a relationship with an original equipment manufacturer ("OEM") that would allow it to satisfy the WAN Optimization project at CBP. BILBY understood that the documents he sent to M.R. would be incorporated into the WAN Optimization procurement package, and would be used as a basis for restricting bidding on the WAN Optimization contract to SDVOSB companies.

26. On or about August 17, 2009, BILBY and other Company T personnel agreed to pay 10 percent of Company T's profit on the WAN Optimization contract to a company owned by two CBP contract employees who worked under M.R. These CBP contract employees were personally involved in the WAN Optimization procurement.

27. On or about August 18, 2009, within the Eastern District of Virginia, BILBY sent an e-mail to J.C., a federal sales manager at Company T's OEM partner for the WAN Optimization deal. In the e-mail, BILBY stated in pertinent part "SDVOSB set aside looks good, but is still not a guarantee. If [M.R.]'s market research isn't accepted, if they feel the dollar

amount is too high, etc, then they may take this out [via a contracting vehicle that would result in wider dissemination of the procurement to prospective bidders]."

28. On or about August 27, 2009, C.E.—one of the CBP contract employees to whom Company T had agreed to pay a portion of the WAN Optimization profits—e-mailed IGCEs for the procurement to BILBY. The IGCEs disclosed that CBP was willing to spend more than $15 million on the procurement.

29. On or about September 1, 2009, within the Eastern District of Virginia, BILBY sent an e-mail to Company F employee Thomas Flynn with the subject line, "Big Favor." In the e-mail, BILBY wrote, "I am very close to putting a proposal out there, but I was hoping you could send me a shell or rough outline of another proposal you've done so that I can work with it? Something with your logo and possibly an executive summary? This is going to be a 20 page proposal…So I'd like to cut and paste into your format."

30. On or about September 2, 2009, Flynn responded to BILBY's e-mail and attached contract proposals that were previously submitted by Company F to various federal agencies. On or about the same date, BILBY sent an e-mail to a contracted proposal writer, stating, "I am going to be doing my 'competitors' bids as well so I've enclosed a sample of what I'm going to be working with." Attached to BILBY's e-mail were the attachments provided earlier that day to BILBY by Flynn.

31. On or about September 2, 2009, C.E. e-mailed BILBY an updated IGCE indicating that CBP had raised its internal estimate for WAN Optimization to approximately $20 million. In the body of the e-mail, C.E. stated "FYI – Mo Money, No Problem!"

32. On or about September 9, 2009, J.C., the federal sales manager at Company T's OEM partner for the WAN Optimization deal, e-mailed a timeline for the WAN Optimization award to BILBY and other Company T personnel. The timeline included dates for the following events, among others: "Bill of Materials Frozen;" "Government signatures done;" "Award to [Company T];" and "Order to [Company T's OEM partner]." At the time of this e-mail, CBP had not publicly advertised the WAN Optimization procurement, let alone determined that the contract would be awarded to Company T and its OEM partner.

33. On or about September 15, 2009, C.E. e-mailed BILBY an updated IGCE indicating that CBP had raised its internal estimate for WAN Optimization to more than $24 million.

34. On or about September 16, 2009, within the Eastern District of Virginia, BILBY forwarded the latest IGCE to J.C. In the e-mail, BILBY wrote, in relevant part, "This is the last one after [M.R.]'s communication to them. Also, I told him to find out what's going on with the signatures and he said he's on board with helping and trying to push this thing through behind the scenes."

35. On or about September 16, 2009, personnel at Company T's OEM partner expressed concern that a legitimate OEM competitor would cause the submission of a lower bid and would win the contract. J.C. relayed these concerns to BILBY and other Company T personnel.

36. On or about September 17, 2009, a CBP procurement officer released a solicitation for bids on the WAN Optimization contract to the companies identified in the WAN Optimization Market Research. This was the first time during the WAN Optimization

procurement process that CBP had formally disclosed its decision to purchase WAN Optimization and its requirements for the contract outside of the agency.

37. On or about September 17, 2009, within the Eastern District of Virginia, BILBY forwarded the WAN Optimization solicitation e-mail to J.C., and stated in pertinent part, "We are very fortunate that this didn't get published on fedbizops, fedbid, etc, and just went out to a select few vendors."

38. On or about September 21, 2009, within the Eastern District of Virginia, BILBY caused Company T to submit a bid on the WAN Optimization contract in the amount of $24,099,117.

39. On or about September 21, 2009, within the Eastern District of Virginia, BILBY and other conspirators caused Company F and the other "friendly" SDVOSB company to submit loser bids on the WAN Optimization contract. Company F's loser bid was in the amount of $26,658,630.39. The other company's loser bid was $29,111,449.95.

40. On or about September 25, 2009, five days prior to the award of the WAN Optimization contract, Company T submitted a purchase order to its OEM partner for the products called for by the contract.

41. On or about September 30, 2009, CBP awarded the contract to Company T in the amount of $24,099,117.

42. On or about March 9, 2010, Company T issued a check to the company owned by C.E. and another CBP contract employee who worked under M.R. The check was in the amount of $351,176.60, which represented approximately 10 percent of Company T's margin on the WAN Optimization contract.

43. The defendant, ANTHONY R. BILBY, agrees that the WAN Optimization contract would not have been awarded to Company T if the CBP contracting officer responsible for approving the contract had known about the conduct described in this Statement of Facts prior to the time the contract was awarded.

LOSER BIDS SUBMITTED BY COMPANIES K AND T

44. In addition to causing Company F and other companies to submit loser bids for the benefit of Companies K and T, BILBY submitted Company K and T loser bids for the benefit of Company F.

45. On or about April 20, 2009, BILBY provided Thomas Flynn's contact information to the manager of Company T's inside sales team and instructed the manager to submit loser bids provided to her by Company F on an ongoing basis. Pursuant to BILBY's instruction, Company T inside sales employees continued to submit loser bids at Company F's request until on or about November 7, 2012.

LOSS AND GAIN

46. Over the course of the conspiracy, the co-conspirators caused losses to the federal government. But for the conduct of the co-conspirators, the contracts at issue generally would have remained open for a longer period of time, or would have been advertised more broadly, in order to solicit legitimate competing bids. Because it is impossible to determine with certainty what legitimate competing bids would have been submitted but for the co-conspirators' conduct, the actual losses to the government cannot be reasonably determined at this time.

47. In total, Companies K and T obtained at least $28,498,836.82 in contracts with the federal government as a result of BILBY's participation in the conspiracy. Companies K and T made at least $3,110,721.41 in profits on these contracts.

48. BILBY received commissions from Companies K and T based on contracts that he obtained for the company. In total, BILBY personally made at least $1,065,103.90 in commissions as a result of his participation in the conspiracy.

49. The conspiracy also resulted in gains to others, including to Company F and its employees. Company F obtained at least $4,743,554.06 in contracts with the federal government through the loser bid practice, and made at least $497,208.90 in profits on those contracts.

ROLE IN THE OFFENSE

50. The conspiracy involved more than five participants. In addition to his own participation in the conspiracy, BILBY and others directed co-conspirators at other companies to submit loser bids, and BILBY introduced inside sales representatives at Company T to the conspiracy.

CONCLUDING STATEMENTS

51. The acts described above were done willfully and knowingly and with the specific intent to violate the law, and not by accident, mistake, inadvertence, or other innocent reason.

52. This Statement of Facts does not contain each and every fact known to the defendant and to the United States concerning the defendant's involvement in the charges set forth in the plea agreement.

Dana J. Boente
Acting United States Attorney

By: _____
Kosta S. Stojilkovic
Assistant United States Attorney
U.S. Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Tel: (703) 299-3700
Fax: (703) 299-3981
kosta.stojilkovic@usdoj.gov

Defendant's Stipulation and Signature

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, ANTHONY R. BILBY, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
ANTHONY R. BILBY

Defense Counsel's Signature

I am the attorney representing ANTHONY R. BILBY. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____
Preston Burton
Counsel for the Defendant